## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DAVID GILL,**

     **Plaintiff,**

vs.

**SYNGENTA AG, and SYNGENTA CROP PROTECTION LLC, and CHEVRON U.S.A. INC.,**

     **Defendants.**

**Civil Action No.:** 3:24-pq-01098-njr

## COMPLAINT

Plaintiff David Gill ('Plaintiff'), complaining of Defendants SYNGENTA AG, SYNGENTA CROP PROTECTION LLC, and CHEVRON U.S.A. INC files this Complaint, directly into MDL No. 3004 in the United States District Court for the Southern District of Illinois. Plaintiff files this *Complaint* as permitted by Case Management Order No. 1 (Doc. #16) and allege as follows:

### I.     SUMMARY OF THE CASE

1.    Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Illinois.

2.    Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold paraquat for use in Illinois, acted in concert with others who manufactured, distributed, and sold paraquat for use in Illinois, sold and used paraquat in

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

Illinois, or owned property in Illinois where paraquat was used.

3.     David Gill was exposed in Illinois to ICI-Chevron paraquat products and/or ICI-Syngenta paraquat products (collectively "Defendants' paraquat products" or "paraquat").

4.     David Gill was exposed to Defendants' paraquat products regularly and frequently over a period of many years.

5.     This case arises out of Defendants' wrongful conduct in connection with the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, and sale of paraquat, the active ingredient in herbicide products that cause Parkinson's Disease. As such, paraquat is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

6.     David Gill suffers from neurological injuries consistent with Parkinson's disease.

7.     David Gill, Plaintiff, brings this suit against Defendants to recover damages for personal injuries resulting from Plaintiff's exposure to paraquat over many years in Illinois.

## II.     PARTIES

### A.  Plaintiff

8.     Plaintiff David Gill is a citizen and resident of the State of Iowa who suffers neurological injuries consistent with Parkinson's disease caused by exposure to paraquat within the State of Illinois.

### B.  Defendants

9.     Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

10.    SCPLLC advertises, promotes, markets, sells, and distributes Paraquat and

other herbicides and pesticides to distributors, dealers, applicators, and farmers, including in the State of Illinois.

11. Defendant Syngenta AG ("SAG") is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. SAG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals. SAG was a publicly traded company on the Swiss stock exchange; American Depositary Receipts for SAG were traded on the New York Stock Exchange until it was acquired by ChemChina, a Chinese state-owned entity, in 2017. It has since been de-listed. On information and belief, SAG continues to operate as a separate unit of ChemChina. SAG wholly owns, through its ownership of Syngenta Seeds, SCPLLC.

12. SAG represents itself as a global company. According to Syngenta's website, SAG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."

13. One or more members of SAG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of SCPLLC and/or Syngenta Seeds.

14. SAG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including SCPLLC, to operate under the general guidance of the Syngenta group control

15. Employees of the Syngenta group as a whole maintain reporting relationships that are not defined by legal, corporate relationships, but in fact cross those corporate lines.

16. SCPLLC is subject to additional oversight that requires it to seek approval for certain decisions from higher levels within the functional reporting structure -- including, in some instances, Syngenta AG. SCPLLC's appointments of senior management personnel also may require, in some instances, approval from individuals or governing bodies that are higher

than SCPLLC's board of directors.

17.     Also, Syngenta AG maintains a central global finance function that governs SCPLLC, which requires SCPLLC to function under the Syngenta AG umbrella and not independently.

18.     In addition, SCPLLC regularly refers to itself as "Syngenta," with no further description.

19.     Defendant Chevron U.S.A., Inc. ("Chevron U.S.A.") is a Pennsylvania corporation with its principal place of business in San Ramon, California.

### III.     JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the Plaintiff and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over SCPLLC because SCPLLC transacts business in the Southern District of Illinois and in the State of Illinois and is a corporation doing business within the Southern District of Illinois as well as within the State of Illinois. SCPLLC knows that its paraquat products are and were sold throughout the State of Illinois and the State of Illinois. In addition, SCPLLC maintains sufficient contacts with both states such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Specific to this case, SCPLLC engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, and labeling pesticides containing paraquat in the State of Illinois and in the State of Illinois, and making a lawsuit by a person injured by paraquat in either Illinois or Illinois foreseeable. SCPLLC purposefully availed itself of the privilege of conducting activities within this

District, thus invoking the benefits and protections of its laws.

22.     In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control made Syngenta Crop Protection the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Prot., Inc*., 830 F. Supp. 2d 550 (S.D. Ill. 2011).

23.     This Court has personal jurisdiction over SAG because, for the reasons alleged above, the jurisdictional contacts of SCPLLC in this state are attributable to SAG because of the unusually high degree of control SAG exercises over these subsidiaries. In addition, on information and belief, SAG and SCPLLC acted in concert under agreements or other arrangements to act in a collective manner and/or as joint venturers regarding the actions and events made the subject of this Complaint. SAG and SCPLLC are therefore jointly and severally liable for the acts for which the Plaintiff complains.

24.     This Court has personal jurisdiction over Chevron U.S.A because Chevron U.S.A transacts business in the Southern District of Illinois and in the State of Illinois and is a corporation doing business within the Southern District of Illinois as well as within the State of Illinois. Chevron U.S.A knows that its paraquat products were sold throughout the State of Illinois and the State of Illinois. In addition, Chevron U.S.A maintains sufficient contacts with both states such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Specific to this case, Chevron U.S.A engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, and labeling pesticides containing paraquat in the State of Illinois and in the State of Illinois, and making a lawsuit by a person injured by paraquat in either Illinois or Illinois foreseeable. Chevron U.S.A purposefully availed itself of the privilege of conducting activities within this District, thus invoking the benefits and protections of its laws.

25.     Venue is proper in the ILLINOIS CENTRAL DISTRICT COURT under 28

U.S.C. § 1391 because Defendants conduct business in this District, are subject to jurisdiction in this District, and have sold, marketed, and/or distributed Paraquat products within this District at all times relevant to this suit, because a substantial part of the acts or occurrences giving rise to this suit occurred within this District.

26.     Notwithstanding, this Complaint is filed in the Southern District of Illinois pursuant to Case Management Order No. 1 of MDL No. 3004, *In re: Paraquat Products Liability Litigation*, allowing cases that would be subject to transfer to the MDL to be filed directly in the Southern District of Illinois. *In re: Paraquat Products Liability Litigation*, 3:21-md-03004-NJR, ECF Document #16. This complaint alleges injury due to paraquat, is subject to jurisdiction of the federal courts due to the diversity of the parties and is subject to transfer pursuant to 28 U.S.C. § 1407 and the transfer order of the Judicial Panel on Multidistrict Litigation. *In re: Paraquat Products Liability Litigation*, 544 F. Supp. 3d 1373, 2021 WL 2369295 (J.P.M.L. June 7, 2021). However, it is not intended as a waiver of any rights relating to *Lexecon*, venue, or choice of law. Plaintiff expressly reserves any *Lexecon* rights or rights relating to venue or choice of law.

### IV.     TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

#### A.     Discovery Rule Tolling

27.     Plaintiff did not know and had no way of knowing about the risk of serious illness associated with exposure to paraquat until sometime after April 2022.

28.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to paraquat is injurious to human health.

29.     Plaintiff did not discover and did not know the facts that would cause a reasonable person to suspect the risks associated with exposure to paraquat; nor would a reasonable and diligent investigation by Plaintiff have disclosed that paraquat would cause or

had caused Plaintiff's injuries.

30.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**B.     Fraudulent Concealment Tolling**

31.     All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

32.     Instead of disclosing critical safety information about paraquat, Defendants consistently and falsely represented the safety of paraquat and those false representations prevented Plaintiff from discovering this claim.

**C.     Estoppel**

33.     Defendants were under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to paraquat.

34.     Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning paraquat and the serious risks associated with the use of and/or exposure to its products.

35.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**V.     ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A.     Defendants and their predecessors.**

*1.     Syngenta Crop Protection LLC and Syngenta AG*

36.     In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as

Imperial Chemical Industries PLC ("ICI").

37.     In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively "ICI Americas").

38.     In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

39.     In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

40.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

41.     Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

42.     As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

43.     After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety

studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

44.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

45.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

46.     As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

47.     In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

48.     In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

49.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

50. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

51. Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

52. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

53. In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

54. SAG is a successor in interest to the crop-protection business of its corporate predecessor Novartis AG.

55. SAG is a successor in interest to the crop-protection business of its corporate predecessor AstraZeneca PLC.

56. SAG is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Group PLC.

57. SAG is a successor in interest to the crop-protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

58. SAG is a successor in interest to the crop-protection business of its corporate

predecessor ICI Bioscience Ltd.

59.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Plant Protection Ltd.

60.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor SCPI.

61.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor NCPI.

62.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Ciba-Geigy Corporation.

63.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Inc.

64.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

65.     SCPLLC does substantial business in the State of Illinois, including the following:

     a.     markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Illinois;

     b.     secures and maintains the registration of paraquat and other pesticides with the EPA and the State of Illinois to enable itself and others to manufacture, distribute, sell, and use these products in the State of Illinois; and

     c.     performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Illinois.

66.     SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

67.     SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

68.   SAG is a management holding company.

69.   Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

70.   SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

71.   The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

72.   The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

73.   SCPAG directly and wholly owns Syngenta International AG ("SIAG").

74.   SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

75.   SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

76.   SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

77.   Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

78.   SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

   a.   SAG directly and wholly owns Syngenta Participations AG;

   b.   Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

   c.   Seeds JV C.V. directly and wholly owns Syngenta Corporation;

   d.   Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;

12

  e. Syngenta Seeds, LLC directly and wholly owns SCPLLC.

79. Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

80. SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

81. SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

82. Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

83. The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

84. SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

85. SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

86. The SEC consists of the CEO and various global Heads, which currently are:

  a. The Chief Executive Officer;

  b. Group General Counsel;

13

    c.   The President of Global Crop Protection;

    d.   The Chief Financial Officer;

    e.   The President of Global Seeds; and

    f.   The Head of Human Resources;

87.    SIAG employs all of the members of the Executive Committee.

88.    Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

89.    SAG's board of directors meets five to six times a year.

90.    In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

91.    Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

92.    Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

93.    Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

94.    Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

95.    The management structure of the Syngenta Group's CP Division, of which

SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

96.    Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

97.    The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

98.    Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

99.    The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

100.    The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

101.    Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

102.    Syngenta Group global Heads that supervise SCPLLC employees participate

15

and have in the past participated in the performance reviews of these employees and in setting their compensation.

103.    The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

104.    SCPLLC performs its functions according to its role in the CP Division structure:

> a.  CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;
>
> b.  New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions forthe entire CP Division.
>
> c.  These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team,or other Syngenta Group global managers;
>
> d.  Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;
>
> e.  Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;
>
> f.  If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;
>
> g.  Decisions to sell the product must be approved by the SEC; and
>
> h.  The products that are sold all bear the same Syngenta trademark and logo.

105.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

106.   These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

107.   For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

108.   Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

109.   Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

110.   Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

111.   SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

   a.   Product development;

   b.   Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

   c.   Production;

   d.   Marketing;

  e. Sales;

  f. Human resources;

  g. Communications and public affairs;

  h. Corporate structure and ownership;

  i. Asset sales and acquisitions;

  j. Key appointments to boards, committees and management positions;

  k. Compensation packages;

  l. Training for high-level positions; and

  m. Finance (including day-to-day cash management) and tax.

112. Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

113. Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

114. The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

115. The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

116. Under the Syngenta Group's global treasury policy, Syngenta Group Treasury

controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

117.    The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

118.    Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

119.    SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

120.    SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Illinois, in the ways previously alleged as to SCPLLC.

### 2. *Chevron*

121.    Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.

122.    In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.

123.    In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Chevron Phillips Chemical Company LP ("CP Chemical").

124.    CP Chemical is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

125.    CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical.

126.    Defendant Chevron U.S.A. is a corporation organized and existing under the

laws of the State of Pennsylvania, with its principal place of business in the State of California.

127.    Defendant Chevron U.S.A. is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

128.    Defendant Chevron U.S.A. is a successor in interest to the crop-protection business of its corporate predecessor CP Chemical.

129.    In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of paraquat products in the United States as alleged in this Complaint.

### B.    Paraquat manufacture, distribution, and sale

130.    ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955. [2]

131.    The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

132.    ICI developed, researched, manufactured, and tested Paraquat through its Central Toxicology Laboratory in the early 1960s and produced the first chemical paraquat formulation, which it registered in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

133.    ICI was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

134.    Paraquat first became commercially available for use in the United States in 1964.

135.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding

---

[2] Sagar, G.R., *Uses and Usefulness of Paraquat*, Human Toxicology (1987) 6:1, 7-11.

the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements").

136.  In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

137.  The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

138.  In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so.

139.  In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so.

140.  In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat.

141.  In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States.

142.  In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

143.  ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for paraquat between them.

144.  Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States.

145.    Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand name Gramoxone.

146.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat.

147.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States.

148.    Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Illinois, where Chevron Chemical registered paraquat products with the State of Illinois and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

149.    Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Illinois, where Chevron Chemical registered such products with the State of Illinois to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

150.    SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

151.     SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Illinois, where they registered such products with the State of Illinois to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

152.     SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

153.     From approximately September 1986 through the present, Syngenta has:

   a.     manufactured paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of Illinois;

   b.     distributed paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of Illinois;

   c.     formulated Paraquat products distributed for sale and use in the United States, including the State of Illinois; and

   d.     distributed Paraquat products for sale and use in the United States, including the State of Illinois.

154.     Syngenta, through SCPLLC, is now the leading manufacturer of Paraquat, which it sells under the brand name GRAMOXONE®.[3]

**C.     Paraquat use**

155.     Since 1964, paraquat has been used in the United States to kill broadleaf weeds

---

[3] Press Release, Federal Trade Commission, FTC Requires China National Chemical Corporation and Syngenta AG to Divest U.S. Assets as Condition of Merger (April 4, 2017), https://www.ftc.gov/news-events/press-releases/2017/04/ftc-requires-china-national-chemical-corporation-syngenta-ag.

and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest.

156.    Paraquat products are commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable.

157.    Paraquat is typically sold by Defendants to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before orafter loading it into the tank of a sprayer and applied by spraying it onto target weeds.

158.    Paraquat concentrate is formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

159.    Paraquat products are typically with applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or at least foreseeable.

**D.    Paraquat exposure**

160.    Each year, paraquat is applied to approximately 15 million acres of agricultural crops, including corn, soybeans, wheat, cotton, fruit and vegetables, rice, orchards and grapes, alfalfa, hay, and other crops.  The following map demonstrates the nationwide use of paraquat in recent years:



USGS, Pesticide National Synthesis Project (2020),
https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2017&map=PARAQUAT&hilo=L&disp=
Paraquat.

161. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

162. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

163. At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles,

lines, or valves were being cleared.

164.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

165.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

166.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

167.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

168.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

169.    At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

170.    At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.    Parkinson's disease**

171.    PD is a progressive neurodegenerative disorder of the brain that affects

primarily the motor system, the part of the central nervous system that controls movement.

172.    Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

### 1.  Symptoms and treatment

173.    The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

174.    PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

175.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

176.    There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### 2.  Pathophysiology

177.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

178.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals

from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

179.   The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

180.   Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

181.   The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

182.   Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

183.   Scientists who study PD generally agree that oxidative stress is a major factor in— if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

### F.   Paraquat's toxicity

184.   Paraquat is highly toxic to both plants and animals.

185.   Paraquat is designed to injure and kill plants by creating oxidative stress, which causes or contributes to cause the degeneration and death of plant cells.

186.   Paraquat injures and kills humans by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

187.   Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong

oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

188.    The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

189.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

190.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.

191.    Paraquat's redox properties have been known within the scientific community since at least the 1930s.

192.    The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make Paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk to all persons exposed to paraquat.

193.    The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

### G.    Paraquat and Parkinson's disease

194.    The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons—paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

195.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals' conditions that show features of PD.

196.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

197.    In animal models of PD, hundreds of studies involving various routes of exposure have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

198.    Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

199.    In 1994, Dr. Afonso Bainy published a study concluding that paraquat in vitro exposure led to an increment in the anti-oxidant capacity of the red blood cell.[4]

200.    In 2002, Dr. Gabriele Schmuck published a study concluding that cortical neurons were found to be more sensitive towards paraquat toxicity than astrocytes as shown by MTT and Neutral Red assay, two different cytotoxicity assays.[5]

201.    In 2019, Dr. Liyan Hou published a study showing that paraquat and maneb

---

[4] Bainy, AC, *et al*, *Influence of lindane and paraquat on oxidative stress-related parameters of erythrocytes in vitro*, Human & Experimental Toxicology (1994), 13:7 461-465.

[5] Schmuck, G, *et al*, *Oxidative stress in rat cortical neurons and astrolytes induced by paraquat in vitro*. Neurotoxicity Research (2002) 4:1, 1-13.

exposure induced ferroptosis, a form of regulated cell death, in SHSY5Y dopaminergic cells.[6]

202.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with occupational exposure to paraquat compared to populations without such exposure.

203.    In June 2011, Dr. Caroline Tanner published a study examining whether pesticides that cause mitochondrial dysfunction or oxidative stress, including paraquat, were associated with Parkinson's Disease or clinical features of parkinsonism in humans.[7] The study found that paraquat use plays a role in human Parkinson's Disease and that "[b]ecause paraquat remains one of the most widely used herbicide worldwide (Frabotta 2009), this finding potentially has great public health significance."[8]

204.    In November 2012, Dr. Samuel Goldman published a study entitled "Genetic Modification of the Association of Paraquat and Parkinson's Disease."[9] The study found that those who applied paraquat and had the GSTT1*0 genotype were 11.1 times more likely to develop Parkinson's disease. Paraquat damages neurons by generating oxidative stress through redox cycling; the GSTT1 gene encodes an enzyme that prevents redox cycling. Around 20% of Caucasians do not have the GSTT1 gene and thus have the GSTT1*0 genotype. The lack of the GSTT1 gene may cause those with the GSTT1*0 genotype to be more vulnerable to paraquat's redox cycling mechanism and therefore more likely to develop Parkinson's.

205.    In July 2002, Dr. Alison McCormack published a study examining the effect of paraquat on mice.[10] The study found that paraquat injections selectively kill dopaminergic

---

[6] Hou L, *et al*, *NADPH oxidase regulates paraquat and maneb-induced dopaminergic neurodegeneration through ferroptosis*, Toxicology (2019), 1:417 64-73.
[7] Tanner, Caroline M., et al., *Rotenone, paraquat, and Parkinson's disease.* 119 Environ Health Perspect. 866-872 (2011).
[8] *Id*.
[9] Samuel M. Goldman et al., *Genetic Modification of the Association of Paraquat and Parkinson's Disease*, 27 Mov.t Disord. 1652-1658 (2012).
[10] Alison L. McCormack et al., *Environmental Risk Factors and Parkinson's Disease: Selective Degeneration of Dopaminergic Neurons Caused by the Herbicide Paraquat* 10 Neurobiol. Dis. 119-127 (2002).

neurons in the SNpc.

206.    Dr. Robert Nisticó published a study in April 2011 that concluded that paraquat causes the cell death of dopaminergic neurons within the substantia nigra, serotonergic neurons within the raphe nuclei, and noradrenergic neurons within the locus coeruleus.[11] The researchers noted that Parkinson's pathology begins in the SNpc and "progressively involves noradrenergic and serotonergic neurons within the locus coeruleus and raphe nuclei."

207.    In December 2011, Dr. Phillip Rappold published a study demonstrating how paraquat entered dopaminergic neurons and killed the neurons through oxidative stress.[12] Paraquat converted to $PQ^+$, which entered dopaminergic neurons through their dopamine transporters. $PQ^+$ then also reacted with dopamine, which enhanced the paraquat-induced oxidative stress. The researchers argued that dopaminergic neurons are more vulnerable to paraquat because $PQ^+$ reacts with dopamine to increase oxidative stress.

208.    In November 2012, Dr. Pei-Chen Lee published a study examining the associations between traumatic brain injuries, Paraquat, and Parkinson's disease.[13] The study found an association between paraquat exposure and Parkinson's.

209.    In May 2013, Dr. Gianni Pezzoli published a meta-analysis examining seven studies on paraquat exposure.[14] The meta-analysis evaluated the seven studies together and separately evaluated the highest quality studies; in both analyses, those exposed to paraquat were more likely to develop Parkinson's disease.

210.    In a memorandum from March 2, 2016, recommending mitigation measures for Paraquat, the EPA acknowledged the numerous studies linking paraquat to Parkinson's disease

---

[11] R. Nisticó et al., *Paraquat- and Rotenone-Induced Models of Parkinson's Disease*, 24 Int. J. Immunopathol. Pharmacol. 313-322 (2011).
[12] Phillip M. Rappold et al., *Paraquat Neurotoxicity is Mediated by the Dopamine Transporter and Organic Cation Transporter-3*, 108 Proc. Natl. Acad. Of Sci. U.S.A. 20766-20771 (2011).
[13] Pie-Chen Lee et al., *Traumatic Brain Injury, Paraquat Exposure, and their Relationship to Parkinson Disease*, 79 Neurology 2061-2066 (2012).
[14] Gianni Pezzoli & Emanuele Cereda, *Exposure to Pesticides or Solvents and Risk of Parkinson Disease*, 80 Neurology 2035-2041 (2013).

stating, "[t]here is a large body of epidemiology data on paraquat dichloride use and Parkinson's disease."[15]

211.    The kidney is the main organ responsible for paraquat excretion and paraquat is known to be highly nephrotoxic.  Dermal exposure to paraquat has revealed inflammatory cell infiltration, tubular necrosis and diffuse interstitial fibrosis.[16]  Paraquat causes toxic chemical reactions to occur in the kidneys, and long-term effects, including kidney failure, are possible.[17]

212.    Extensive exposure to Paraquat, like that experienced by Plaintiff, have been shown to more than double the risk of end stage renal disease.

213.    Switzerland, where SAG maintains its headquarters, has not only prohibited the use of paraquat since 1989 but recently amended the law on chemical substances to prohibit the export of paraquat to help protect the health and environment in importing countries, particularly in the developing world.[18]

214.    The Ministry of Agriculture of the People's Republic of China classifies paraquat as extremely toxic. Paraquat's use or sale in China has been prohibited since September 1, 2020.[19]

215.    Paraquat use has been banned in the European Union since 2007.[20]

216.    Defendants had knowledge of these studies and the relationship between paraquat exposure and PD but actively and fraudulently concealed this information from Plaintiff and others.

---

[15] Environmental Protection Agency, Paraquat Dichloride; Proposed Mitigation Decision (March 2, 2016), https://www.regulations.gov/document/EPA-HQ-OPP-2011-0855-0031.
[16] Tungsanga K, Chusilp S, Israsena S, Sitprija V. Paraquat poisoning: evidence of systemic toxicity after dermal exposure. Postgrad Med J 1983; 59(691):338-9.dd
[17] Centers for Disease Control and Prevention, Facts About Paraquat, https://emergency.cdc.gov/agent/paraquat/basics/facts.asp.
[18] *Switzerland bans the export of five toxic chemicals, including paraquat*, MercoPress (October 16, 2020 09:20 UTC), https://en.mercopress.com/2020/10/16/switzerland-bans-the-export-of-five-toxic-chemicals-including-paraquat.
[19] Business Wire, *2018 Market Research on Paraquat in China*, AP, (September 10, 2018), https://apnews.com/press-release/pr-businesswire/0625d4cb368247b38ea803ff3842c203.
[20] *EU Court Reimposes Ban on Paraquat Weedkiller*, Reuters, July 11, 2007, https://www.reuters.com/article/environment-eu-paraquat-dc/eu-court-reimposes-ban-on-paraquat-weedkiller-idUSL1166680020070711.

### H.     Paraquat regulation

217.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.§ 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

218.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

219.     FIFRA generally requires that the registrant conduct health and safety testing of pesticides. The government is not required to, nor does it generally, perform the product tests that are required of the manufacturer.

220.     FIFRA does not require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

221.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

   a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

   b.  its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

   c.  it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

   d.  when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

222.     FIFRA defines "unreasonable adverse effects on the environment'' as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

223.     Under FIFRA, "[a]s long as no cancellation proceedings are in effect

registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

224.    However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

225.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person…any pesticide which is…misbranded." 7 U.S.C. § 136j(a)(1)(E).

226.    A pesticide is misbranded under FIFRA if, among other things:

   a.    its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. §136(q)(1)(A);

   b.    the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

   c.    the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. §136(q)(l)(G).

227.    Syngenta has long misrepresented and denied the harmful side effects of its paraquat-based products.

228.    In response to growing concern about the safety of paraquat, Syngenta established a website at www.paraquat.com for the purpose of persuading the public that paraquat is safe.

229.    Syngenta's statements proclaiming the safety of paraquat and disregarding its dangers were designed to mislead the agricultural community and the public at large, including Plaintiff.

230.    As of the filing of this Complaint, www.paraquat.com has been taken down by Syngenta.

231.    Defendants knew or should have known that paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

232.    Defendants failed to appropriately and adequately test its paraquat-based products to protect individuals like Plaintiff from the hazards of exposure to Paraquat.

233.    Despite its knowledge that exposure to paraquat was dangerous, Defendants continued to promote their Paraquat-based products as safe.

234.    In fact, in 2003, when Syngenta was dealing with lawsuits regarding another toxic herbicide, atrazine, it was reported that "Sherry Ford, the communications manager, wrote in her notebook that the company 'should not phase out [atrazine] until we know about' the Syngenta herbicide Paraquat, which has also been controversial, because of studies showing that it might be associated with Parkinson's disease. She noted that atrazine 'focuses attention away from other products.'"[21]

235.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff brings claims and seek relief in this action only under state law, and do not bring any claims or seek any relief in this action under

---

[21] Rachel Aviv, *A Valuable Reputation*, The New Yorker, (Feb 3, 2014), https://www.newyorker.com/magazine/2014/02/10/a-valuable-reputation.

FIFRA.

236.    Defendants' failure to adequately warn Plaintiff resulted in: (1) Plaintiff being exposed to paraquat; and (2) scientists and physicians failing to warn and instruct the public, particularly those living in agricultural areas where paraquat-based pesticides are heavily sprayed, about the risk of Parkinson's disease and renal disease with exposure to paraquat.

237.    By reason of the foregoing, Plaintiff is severely and permanently injured and has been diagnosed with Parkinson's Disease.

238.    By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Defendants' actions and inactions.

239.    Plaintiff was regularly exposed to Paraquat as a result of direct exposure via handling, mixing, loading, spraying and cleaning up paraquat.

240.    Plaintiff subsequently began experiencing symptoms of Parkinson's Disease and was diagnosed with Parkinson's Disease in approximately 2018.

241.    As a result of Plaintiff's injuries, Plaintiff incurred significant economic and non-economic damages.

242.    Plaintiff was directly exposed to Defendants' paraquat products from approximately 1970 - 2010 while working on his family farm, located in Wyoming, Illinois.

243.    During the entire time that Plaintiff was exposed to paraquat, Plaintiff did not know that exposure to paraquat when handled according to the instructions could be injurious to Plaintiff or others.

244.    Plaintiff first learned that exposure to paraquat can cause Parkinson's disease, end stage renal disease, and other serious illnesses sometime after April 2022.

## VI.    ALLEGATIONS COMMON TO SPECIFIC CAUSES OF ACTION

### A.    Strict product liability – design defect

245.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. paraquat business.

246.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

247.     Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold andused in Illinois.

248.     The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

     a.  it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed; and

     b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

249.     This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

250. As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

251. The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

### B.     Strict product liability – failure to warn

252. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

253. Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

254. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

        a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

255.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

a. it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed; and

b. it was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerativedisease, including PD, to develop long after exposure.

256.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

257.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

258. The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

### C. Negligence

259. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

260. Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold andused in Illinois.

261. The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

262. At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff.

263. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants,

Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

    a.   it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed; and

    b.   when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

    264.   In breach of the aforementioned duty to Plaintiff, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

    a.   failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who usedit, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    b.   designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby whileit was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeatedexposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

    c.   failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    d.   failed to perform adequate testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

    e.   failed to perform adequate testing to determine the extent to which paraquat,

when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD,to develop long after exposure;

f.   failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons whoused it, who were nearby while it was being used, or who entered fields or orchardswhere it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause orcontribute to cause clinically significant neurodegenerative disease, including PD,to develop long after exposure;

g.   failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.   failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

### D.  Consumer Protection Act

265.   At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used by Plaintiff.

266.   Plaintiff was exposed to paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used and that Plaintiff, a member of Plaintiff's family, and/or Plaintiff's employer purchased for the purpose of controlling weeds and not for resale.

267.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert had actual or constructive knowledge that when used in the intended and directed manner or a reasonably foreseeable manner:

    a.  paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

268.    From the first date on which Defendants, Defendants' corporate predecessors, and others with whom they acted in concert placed paraquat that they designed, manufactured, distributed and sold into the stream of commerce through the last date on which Plaintiff was exposed to paraquat that they designed, manufactured, distributed, and sold, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert engaged in unfair or deceptive acts or practices, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, regarding their design, manufacture, distribution, and sale of paraquat, in that they:

    a.  concealed, suppressed, or omitted to disclose that paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    b.  concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after

exposure.

c.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

269.   These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat for use were "unfair" because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

270.   These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were immoral and unethical, as they served only to benefit Defendants, Defendants' corporate predecessors, and others with whom they acted in concert at the expense of the health of

purchasers and users of paraquat and the public.

271.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause substantial injury to purchasers and users of paraquat and the public by exposing them to unnecessary risks to their health.

272.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that but for these acts and practices paraquat would not have been purchased and persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed would not have been injured by it.

273.    The injuries caused by these acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat, namely purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, including Plaintiff, are not outweighed by any countervailing benefit to consumers or competition.

274.    The injuries caused by these acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat, namely purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, including Plaintiff, were not reasonably avoidable; because Defendants,

Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing, and selling paraquat were the sole sources of material information and they failed to disclose this information, and consumers therefore could not have had reason to anticipate the impending harm and thus avoid their injuries.

275.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert intended that purchasers of the paraquat that they manufactured, distributed, and sold and to which Plaintiff was exposed, would purchase it in reliance on these unfair and deceptive acts and practices.

276.    The facts that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert concealed, suppressed, or omitted to disclose were material to the decisions to purchase the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert manufactured, distributed, and sold and to which Plaintiff was exposed, in that it would not have been purchased had these facts been disclosed.

277.    These unfair and deceptive acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert occurred in connection with their conduct of trade and commerce.

### E.    Breach of implied warranty of merchantability

278.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides and holding themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

279.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured,

distributed, and sold paraquat intending or expecting that it would be sold and used in Illinois.

280.    Plaintiff was exposed to paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

281.    At the time of each sale of paraquat to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

282.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

    a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it hadbeen sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

### COUNT 1
### DEFENDANTS SCPLLC AND SAG
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### PERSONAL INJURIES

283.    At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed paraquat products as described above to which Plaintiff was exposed.

284.    Paraquat products were expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which they were produced, manufactured, sold, distributed, and/or marketed by Defendants.

285.    At those times, paraquat products were in an unsafe, defective condition that was unreasonably dangerous to users, and in particular, to the Plaintiff.

286.    For many years, Plaintiff was exposed to Defendants' paraquat products regularly and repeatedly for hours at a time resulting in regular, repeated, and prolonged exposure of Plaintiff to paraquat.

287.    The paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the paraquat products.

288.    The paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of Defendants or their manufacturers and/or suppliers, they were unreasonably dangerous, unreasonably dangerous in normal use, and they were more dangerous than an ordinary consumer would expect.  On balance, the unreasonable risks posed by paraquat products outweighed the benefits of their design.

289.    At all relevant times, paraquat products were in a defective condition and unsafe, and Defendants knew or had reason to know they were defective and unsafe, especially when used in the form and manner as intended by Defendants. In particular, the paraquat products were defective in the following ways:

   a.  Paraquat products were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, while they were being used, or entered fields or orchards where they have been sprayed or areas near where

they had been sprayed; and

b.   when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological or renal damage, and repeated neurodegenerative disease, including Parkinson's disease to develop over time and manifest long after exposure.

290.   In breach of their duty to Plaintiff, Defendants acted negligently, and in conscious disregard for the safety of others:

a.   failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.   designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause latent, cumulative, and permanent neurological or renal damage, and repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.   failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption; into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.   failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

e.   failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over

time and manifest long after exposure;

  f. failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

  g. failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

  h. failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause significant renal or neurodegenerative disease, including PD.

  291. Defendants knew or should have known that at all relevant times that their paraquat products were in a defective condition and were (and are) unreasonably dangerous and unsafe and would create a substantial risk of harm to persons who used them, were nearby while Paraquat products were being used, or entered fields or orchards where paraquat products had been sprayed or areas near where paraquat products had been sprayed.

  292. Armed with this knowledge, Defendants voluntarily designed their paraquat products with a dangerous condition knowing that in normal, intended use, consumers such as Plaintiff would be exposed to it.

  293. Plaintiff was exposed to paraquat without knowledge of paraquat's dangerous characteristics.

  294. At the time of Plaintiff's exposure to paraquat, paraquat was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

  295. The paraquat products designed, researched, manufactured, tested, advertised,

promoted, marketed, sold, and/or distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

296.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed a defective product, which created an unreasonable risk to the consumer and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

297.   Plaintiff could not, by the exercise of reasonable care, have discovered paraquat's defects herein mentioned or perceived its danger.

298.   Defendants are thus strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and/or selling of a defective product which they negligently designed.

299.   Defendants' defective design of paraquat products amounts to willful, wanton, and/or reckless conduct.

300.   As a direct and proximate result of the defects in Defendants' paraquat products were the cause or a substantial factor in causing Plaintiff's injuries.

301.   As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

**COUNT 2**
**DEFENDANTS SCPLLC AND SAG**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**PERSONAL INJURIES**

302.    Defendants engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting paraquat, and through that conduct have knowingly and intentionally placed paraquat into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who was exposed to it through ordinary and reasonably foreseeable uses.

303.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote paraquat products. Additionally, Defendants expected the paraquat that they were selling, distributing, supplying, manufacturing, and/or promoting to reach Plaintiff without any substantial change in the condition of the product from when it was initially distributed.

304.    At the time of manufacture, Defendants knew, or in the exercise of ordinary care, should have known that:

    a.  Defendants' paraquat products were designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of people who used it, who were nearby when it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological or renal damage that was both permanent and cumulative, and that repeated exposures were likely to cause renal or neurodegenerative disease, including PD.

305.    At all relevant times, Defendants' paraquat products were in a defective condition such that they were unreasonably dangerous to those exposed to them and was so at the time they were distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product.  The defective condition of paraquat was due in part to the fact that it was not accompanied by proper warnings regarding its toxic qualities and possible health effects, including, but not limited to, developing Parkinson's disease or renal disease as a result of exposure.  That defective condition was not a common propensity of the paraquat products that would be obvious to a user of those products.

306.     Defendants' paraquat products did not contain a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

307.     Defendants failed to include a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed.

308.     Defendants could have revised paraquat's label to provide additional warnings.

309.     This defect caused serious injury to Plaintiff, who was exposed to Paraquat in its intended and foreseeable manner.

310.     At all relevant times, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

311.     Defendants labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

312.     Defendants failed to warn of the nature and scope of the health risks associated with Paraquat, namely its toxic properties and its propensity to cause or serve as a substantial contributing factor in the development of Parkinson's disease or renal disease.

313.     Defendants knew of the probable consequences of exposure to paraquat. Despite this fact, Defendants failed to exercise reasonable care to warn of the dangerous toxic properties and risks of developing Parkinson's disease or renal disease from paraquat exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiff's safety.

314.     At the time of exposure, Plaintiff could not have reasonably discovered any defect in paraquat through the exercise of reasonable care.

315.    Defendants, as manufacturers and/or distributors of paraquat, are held to the level of knowledge of an expert in the field. There was unequal knowledge with respect to the risk of harm, and Defendants, as manufacturers of paraquat products possessed superior knowledge and knew or should have known that harm would occur in the absence of a necessary warning.

316.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

317.    Had Defendants properly disclosed the risks associated with paraquat, Plaintiff would have taken steps to avoid exposure to paraquat.

318.    The information that Defendants provided failed to contain adequate warnings and precautions that would have enabled users to use the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to paraquat; continued to promote the efficacy of paraquat, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to paraquat.

319.    To this day, Defendants have failed to adequately warn of the true risks of exposure to paraquat, including the risks manifested by Plaintiff's injuries associated with exposure to paraquat.

320.    As a result of its inadequate warnings, paraquat was defective and unreasonably dangerous when it left Defendants' possession and/or control, was distributed by Defendants, and when Plaintiff was exposed to it.

321.    As a direct and proximate result of the lack of adequate directions for the use

of and warnings about the dangers of the paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries consistent with and including PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

**COUNT 3**
**DEFENDANTS SCPLLC AND SAG**
**NEGLIGENCE**
**PERSONAL INJURIES**

322.    Defendants had a duty to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of paraquat products into the stream of commerce, including a duty to assure that the product would not cause those exposed to it to suffer unreasonable and dangerous side effects.

323.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of paraquat products in that Defendants knew or should have known that persons foreseeably exposed to paraquat products were placed at a high risk of suffering unreasonable and dangerous side effects, including, but not limited to, the development of Parkinson's disease or renal disease, as well as other severe and personal injuries that are permanent and lasting in nature; physical pain and mental anguish, including diminished enjoyment of life; and a need for lifelong medical treatment, monitoring, and/or medications.

324.    The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.  manufacturing, producing, promoting, formulating, creating, and/or designing paraquat products without thoroughly testing it;

b.  failing to test paraquat products and/or failing to adequately, sufficiently, and properly test paraquat products;

c.  not conducting sufficient testing programs to determine whether paraquat products were safe for use -- Defendants knew or should have known that paraquat products were unsafe and unfit for use because of the dangers to those exposed to it;

d.  not conducting sufficient testing programs and studies to determine paraquat product's effects on human health even after Defendants had knowledge of studies linking paraquat products to latent neurological damage and neurodegenerative disease, including Parkinson's disease, and renal disease;

e.  negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of paraquat products;

f.  failing to provide adequate cautions and warnings to protect the health of persons who would reasonably and foreseeably be exposed to paraquat products;

g.  negligently marketing, advertising, and recommending the use of paraquat products without sufficient knowledge as to its dangerous propensities;

h.  negligently representing that paraquat products were safe for use for its intended purpose when, in fact, it was unsafe;

i.  negligently representing that paraquat products had equivalent safety and efficacy as other forms of herbicides;

j.  negligently designing paraquat products in a manner that was dangerous to others;

k.  negligently manufacturing paraquat products in a manner that was dangerous to others;

l.  negligently producing paraquat products in a manner that was dangerous to others;

m.  negligently formulating paraquat products in a manner that was dangerous to others;

n.  concealing information from the Plaintiff while knowing that paraquat products were unsafe, dangerous, and/or non-conforming with EPA regulations;

o.  improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of

risks and dangers of paraquat products compared to other forms of herbicides; and

p.   negligently selling paraquat products with a false and misleading label.

325.   Defendants under-reported, underestimated, and downplayed the serious dangers of paraquat products.

326.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of paraquat products in that Defendants:

a.   failed to use ordinary care in designing and manufacturing paraquat products so as to avoid the aforementioned risks to individuals when paraquat was used as an herbicide;

b.   failed to accompany paraquat products with proper and/or accurate warnings regarding all possible adverse effects associated with exposure to paraquat;

c.   failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the effects including, but not limited to, developing Parkinson's disease or renal disease;

d.   failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of paraquat products;

e.   misrepresented the evidence of paraquat's neurotoxicity; and

f.   were otherwise careless and/or negligent.

327.   Despite the fact that Defendants knew or should have known that paraquat products caused, or could cause, unreasonably dangerous health effects, Defendants continue to market, manufacture, distribute, and/or sell paraquat products to consumers.

328.   Defendants knew or should have known that consumers like Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care.

329.   Defendants' negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered.

330.   As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed

neurological injuries consistent with and including Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

## COUNT 4
## DEFENDANTS SCPLLC AND SAG
## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 et seq.)

331.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

332.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used by Plaintiff.

333.    Plaintiff was exposed to paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used and that Plaintiff, a member of Plaintiff's family, and/or Plaintiff's employer purchased for the purpose of controlling weeds and not for resale.

334.    These acts and practices of Defendants, Defendants' corporate predecessors,

and others with whom they acted in concert in manufacturing, distributing and selling paraquat for use were "unfair" because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

335.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were immoral and unethical, as they served only to benefit Defendants, Defendants' corporate predecessors, and others with whom they acted in concert at the expense of the health of purchasers and users of paraquat and the public.

336.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause substantial injury to purchasers and users of paraquat and the public by exposing them to unnecessary risks to their health.

337.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that, but for these acts and practices, paraquat would not have been purchased by persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed would not have been injured by it.

338.    Plaintiff is entitled to recover costs and reasonable attorney's fees pursuant to 815 ILCS 505/10a.

339.    As a direct and proximate result of the violations of the Consumer Fraud and Deceptive Business Practices Act by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the

remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

340.  Alternatively, the Consumer Protection Act of the State of Illinois applies to this claim and Plaintiff adopts all of the facts set forth above as allegations supporting a claim under that law

### COUNT 5
### DEFENDANTS SCPLLC AND SAG
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### PERSONAL INJURIES

341.  At all relevant times, Defendants were engaged in the business of selling paraquat products and was a merchant with respect to those products.

342.  At all relevant times, Defendants intended and expected that Defendants' paraquat products would be sold and used.

343.  Defendants developed, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated, and distributed Defendants' paraquat products for sale in the United States.

344.  Plaintiff was exposed Defendants' paraquat products regularly and repeatedly, for hours at a time, resulting in regular, repeated, and prolonged exposure to paraquat.

345.  At the time of each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, Defendants impliedly warranted that Defendants' paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

346.  Defendants breached this warranty as to each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, in that Defendants' paraquat products were not of merchantable quality because they were not fit for the ordinary purpose for which

such goods were used by Plaintiff who was either in direct privity with Defendants through purchase of the paraquat products or was an employee of the purchaser to whom the warranty was directly made and, therefore, an intended third-party beneficiary of such warranties

347.    As a direct and proximate result of the breaches of the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries consistent with and including PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

### COUNT 6
### DEFENDANTS SCPLLC AND SAG
### PUNITIVE DAMAGES

348.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of paraquat. Nonetheless, Defendants deliberately crafted their label, marketing and promotion of paraquat to mislead farmers, consumers and others who were foreseeably likely to be exposed to paraquat.

349.    This was not done by accident or through typical justifiable negligence. Defendants knew that they could turn a profit by convincing the agricultural industry that paraquat did not cause Parkinson's Disease, and that full disclosure of the true risks of paraquat would limit the amount of money Defendants would make in selling paraquat in Illinois. Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged herein. Plaintiff was denied the right to make

an informed decision about whether to purchase, use, or be exposed to an herbicide/pesticide knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights and through the willful and wanton conduct of Defendants.

350.     There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiff.

### COUNT 7
### DEFENDANTS CHEVRON U.S.A. INC.
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### PERSONAL INJURIES

351.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed paraquat products as described above to which Plaintiff was exposed.

352.     Paraquat products were expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which they were produced, manufactured, sold, distributed, and/or marketed by Defendants.

353.     At those times, paraquat products were in an unsafe, defective condition that was unreasonably dangerous to users, and in particular, to the Plaintiff.

354.     For many years, Plaintiff was exposed to Defendants' paraquat products regularly and repeatedly for hours at a time resulting in regular, repeated, and prolonged exposure of Plaintiff to paraquat.

355.     The paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the paraquat products.

356.     The paraquat products designed, researched, manufactured, tested, advertised,

promoted, marketed, sold, and/or distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of Defendants or their manufacturers and/or suppliers, they were unreasonably dangerous, unreasonably dangerous in normal use, and they were more dangerous than an ordinary consumer would expect.  On balance, the unreasonable risks posed by paraquat products outweighed the benefits of their design.

357.   At all relevant times, paraquat products were in a defective condition and unsafe, and Defendants knew or had reason to know they were defective and unsafe, especially when used in the form and manner as intended by Defendants. In particular, the paraquat products were defective in the following ways:

    a.  Paraquat products were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, while they were being used, or entered fields or orchards where they have been sprayed or areas near where they had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological or renal damage, and repeated neurodegenerative disease, including Parkinson's disease to develop over time and manifest long after exposure.

358.   In breach of their duty to Plaintiff, Defendants acted negligently, and in conscious disregard for the safety of others:

    a.  failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

    b.  designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause latent, cumulative, and permanent neurological or renal damage, and repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative

disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.   failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption; into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.   failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

e.   failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.   failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

g.   failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.   failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause significant renal or neurodegenerative disease, including PD.

359.    Defendants knew or should have known that at all relevant times that their paraquat products were in a defective condition and were (and are) unreasonably dangerous and unsafe and would create a substantial risk of harm to persons who used them, were nearby while Paraquat products were being used, or entered fields or orchards where paraquat products had been sprayed or areas near where paraquat products had been sprayed.

360.    Armed with this knowledge, Defendants voluntarily designed their paraquat products with a dangerous condition knowing that in normal, intended use, consumers such as Plaintiff would be exposed to it.

361.    Plaintiff was exposed to paraquat without knowledge of paraquat's dangerous characteristics.

362.    At the time of Plaintiff's exposure to paraquat, paraquat was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

363.    The paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

364.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed a defective product, which created an unreasonable risk to the consumer and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

365.    Plaintiff could not, by the exercise of reasonable care, have discovered paraquat's defects herein mentioned or perceived its danger.

366.    Defendants are thus strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and/or selling of a defective product which they negligently designed.

367.    Defendants' defective design of paraquat products amounts to willful, wanton, and/or reckless conduct.

368.   As a direct and proximate result of the defects in Defendants' paraquat products were the cause or a substantial factor in causing Plaintiff's injuries.

369.   As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by Chevron U.S.A. Inc., Chevron Chemicals, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

**COUNT 8**
**DEFENDANTS CHEVRON U.S.A. INC.**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**PERSONAL INJURIES**

370.   Defendants engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting paraquat, and through that conduct have knowingly and intentionally placed paraquat into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who was exposed to it through ordinary and reasonably foreseeable uses.

371.   Defendants did in fact sell, distribute, supply, manufacture, and/or promote paraquat products. Additionally, Defendants expected the paraquat that they were selling, distributing, supplying, manufacturing, and/or promoting to reach Plaintiff without any substantial change in the condition of the product from when it was initially distributed.

372.    At the time of manufacture, Defendants knew, or in the exercise of ordinary care, should have known that:

     a.  Defendants' paraquat products were designed, manufactured, formulated,

and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of people who used it, who were nearby when it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological or renal damage that was both permanent and cumulative, and that repeated exposures were likely to cause renal or neurodegenerative disease, including PD.

373.    At all relevant times, Defendants' paraquat products were in a defective condition such that they were unreasonably dangerous to those exposed to them and was so at the time they were distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product.  The defective condition of paraquat was due in part to the fact that it was not accompanied by proper warnings regarding its toxic qualities and possible health effects, including, but not limited to, developing Parkinson's disease or renal disease as a result of exposure.  That defective condition was not a common propensity of the paraquat products that would be obvious to a user of those products.

374.    Defendants' paraquat products did not contain a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

375.    Defendants failed to include a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed.

376.    Defendants could have revised paraquat's label to provide additional warnings.

377.    This defect caused serious injury to Plaintiff, who was exposed to Paraquat in its intended and foreseeable manner.

378.    At all relevant times, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

379.    Defendants labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

380.    Defendants failed to warn of the nature and scope of the health risks associated with Paraquat, namely its toxic properties and its propensity to cause or serve as a substantial contributing factor in the development of Parkinson's disease or renal disease.

381.    Defendants knew of the probable consequences of exposure to paraquat. Despite this fact, Defendants failed to exercise reasonable care to warn of the dangerous toxic properties and risks of developing Parkinson's disease or renal disease from paraquat exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiff's safety.

382.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in paraquat through the exercise of reasonable care.

383.    Defendants, as manufacturers and/or distributors of paraquat, are held to the level of knowledge of an expert in the field. There was unequal knowledge with respect to the risk of harm, and Defendants, as manufacturers of paraquat products possessed superior knowledge and knew or should have known that harm would occur in the absence of a necessary warning.

384.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

385.    Had Defendants properly disclosed the risks associated with paraquat, Plaintiff would have taken steps to avoid exposure to paraquat.

386.    The information that Defendants provided failed to contain adequate warnings and precautions that would have enabled users to use the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and

misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to paraquat; continued to promote the efficacy of paraquat, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to paraquat.

387.    To this day, Defendants have failed to adequately warn of the true risks of exposure to paraquat, including the risks manifested by Plaintiff's injuries associated with exposure to paraquat.

388.    As a result of its inadequate warnings, paraquat was defective and unreasonably dangerous when it left Defendants' possession and/or control, was distributed by Defendants, and when Plaintiff was exposed to it.

389.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by Chevron U.S.A. Inc., Chevron Chemicals, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries consistent with and including Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

**COUNT 9**
**DEFENDANTS CHEVRON U.S.A. INC.**
**NEGLIGENCE**
**PERSONAL INJURIES**

390.    Defendants had a duty to exercise ordinary care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of paraquat products into the stream of commerce, including a duty to assure that the product would not cause those exposed to it to suffer unreasonable and dangerous side effects.

391.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of paraquat products in that Defendants knew or should have known that persons foreseeably exposed to paraquat products were placed at a high risk of suffering unreasonable and dangerous side effects, including, but not limited to, the development of Parkinson's disease or renal disease, as well as other severe and personal injuries that are permanent and lasting in nature; physical pain and mental anguish, including diminished enjoyment of life; and a need for lifelong medical treatment, monitoring, and/or medications.

392.    The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.  manufacturing, producing, promoting, formulating, creating, and/or designing paraquat products without thoroughly testing it;

    b.  failing to test paraquat products and/or failing to adequately, sufficiently, and properly test paraquat products;

    c.  not conducting sufficient testing programs to determine whether paraquat products were safe for use -- Defendants knew or should have known that paraquat products were unsafe and unfit for use because of the dangers to those exposed to it;

    d.  not conducting sufficient testing programs and studies to determine paraquat product's effects on human health even after Defendants had knowledge of studies linking paraquat products to latent neurological damage and neurodegenerative disease, including Parkinson's disease, and renal disease;

    e.  negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of paraquat products;

    f.  failing to provide adequate cautions and warnings to protect the health of persons who would reasonably and foreseeably be exposed to paraquat

products;

g.  negligently marketing, advertising, and recommending the use of paraquat products without sufficient knowledge as to its dangerous propensities;

h.  negligently representing that paraquat products were safe for use for its intended purpose when, in fact, it was unsafe;

i.  negligently representing that paraquat products had equivalent safety and efficacy as other forms of herbicides;

j.  negligently designing paraquat products in a manner that was dangerous to others;

k.  negligently manufacturing paraquat products in a manner that was dangerous to others;

l.  negligently producing paraquat products in a manner that was dangerous to others;

m.  negligently formulating paraquat products in a manner that was dangerous to others;

n.  concealing information from the Plaintiff while knowing that paraquat products were unsafe, dangerous, and/or non-conforming with EPA regulations;

o.  improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of paraquat products compared to other forms of herbicides; and

p.  negligently selling paraquat products with a false and misleading label.

393.  Defendants under-reported, underestimated, and downplayed the serious dangers of paraquat products.

394.  Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of paraquat products in that Defendants:

a.  failed to use ordinary care in designing and manufacturing paraquat products so as to avoid the aforementioned risks to individuals when paraquat was used as an herbicide;

b.  failed to accompany paraquat products with proper and/or accurate warnings regarding all possible adverse effects associated with exposure to paraquat;

    c.  failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the effects including, but not limited to, developing Parkinson's disease or renal disease;

    d.  failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of paraquat products;

    e.  misrepresented the evidence of paraquat's neurotoxicity; and

    f.  was otherwise careless and/or negligent.

395.   Despite the fact that Defendants knew or should have known that paraquat products caused, or could cause, unreasonably dangerous health effects, Defendants continue to market, manufacture, distribute, and/or sell paraquat products to consumers.

396.   Defendants knew or should have known that consumers like Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care.

397.   Defendants' negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered.

398.   As a direct and proximate result of the negligence of Chevron U.S.A. Inc., Chevron Chemicals, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries consistent with and including PD; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

## COUNT 10
## DEFENDANTS CHEVRON U.S.A. INC.
## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 et seq.)

399.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

400.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used by Plaintiff.

401.    Plaintiff was exposed to paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used and that Plaintiff, a member of Plaintiff's family, and/or Plaintiff's employer purchased for the purpose of controlling weeds and not for resale.

402.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat for use were "unfair" because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

403.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were immoral and unethical, as they served only to benefit Defendants, Defendants' corporate predecessors, and others with whom they acted in concert at the expense of the health of purchasers and users of paraquat and the public.

404.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause substantial injury to purchasers and users of paraquat and the public by

exposing them to unnecessary risks to their health.

405.    These acts and practices of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling paraquat were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that, but for these acts and practices, paraquat would not have been purchased by persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed would not have been injured by it.

406.    Plaintiff is entitled to recover costs and reasonable attorney's fees pursuant to 815 ILCS 505/10a.

407.    As a direct and proximate result of the violations of the Consumer Fraud and Deceptive Business Practices Act by Chevron U.S.A. Inc., Chevron Chemicals, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of their life.

408.    Alternatively, the Consumer Protection Act of the State of Illinois applies to this claim and Plaintiff adopts all of the facts set forth above as allegations supporting a claim under that law.

**COUNT 11**
**DEFENDANTS CHEVRON U.S.A. INC.**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PERSONAL INJURIES**

409.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides and holding themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

410.    Plaintiff was exposed to paraquat sold, transported, and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold, transported and used in Illinois.

411.    At the time of each sale of paraquat to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

412.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used.

413.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Chevron U.S.A. Inc., Chevron Chemicals, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries consistent with and including Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of their life; has suffered the loss of a normal life and will continue to do so for the remainder of their life; has lost income that he otherwise would have earned and will continue to do so for the remainder of their life; and has incurred reasonable expenses for necessary medical treatment and will

continue to do so for the remainder of their life.

## COUNT 12
## DEFENDANTS CHEVRON U.S.A. INC.
## PUNITIVE DAMAGES

414.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of paraquat. Nonetheless, Defendants deliberately crafted their label, marketing and promotion of paraquat to mislead farmers, consumers and others who were foreseeably likely to be exposed to paraquat.

415.    This was not done by accident or through typical justifiable negligence. Defendants knew that they could turn a profit by convincing the agricultural industry that paraquat did not cause Parkinson's Disease, and that full disclosure of the true risks of paraquat would limit the amount of money Defendants would make in selling paraquat in Illinois. Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged herein. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide/pesticide knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights and through the willful and wanton conduct of Defendants.

416.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiff.

### PRAYER FOR RELIEF

417.    As a result of the foregoing, Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants, jointly and severally:

   a.  for compensatory damages in excess of $75,000, exclusive of interests and costs,

   b.  Costs of suit

c.  Pre- and post-judgment interest and attorneys' fees,

d.  Punitive damages: and

e.  Such further relief to which this Court deems just and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

418.    Pursuant to FED. R. CIV. P. 38(b), Plaintiff respectfully demands a jury trial on

all issues triable by jury.

Dated: <u>April 15, 2024</u>              Respectfully submitted,

By:   <u>/s/ Russell W. Lewis, IV</u>
      Russell W. Lewis, IV (IL Bar No. 6297031)
      JOHNSON LAW GROUP
      2925 Richmond Avenue, Suite 1700
      Houston, Texas 77098
      Phone: (713) 626-9336
      Fax: (713) 583-9460
      Email: paraquat@johnsonlawgroup.com

      *Counsel for Plaintiff*